*Not served to allocaditors no time to oppose*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF PUERTO RICO**

| In re: | Bankruptcy No.: 04-10645 (GAC) |
|---|---|
| ATLANTIS HEALTHCARE GROUP PUERTO RICO, INC. | Chapter 11 |
| Debtor | |

### GAMBRO, INC.'S MOTION TO DISMISS

TO THE HONORABLE GERARDO A. CARLO,
UNITED STATES CHIEF BANKRUPTCY JUDGE:

COMES NOW Gambro, Inc., as administrative agent for Gambro AB (collectively "Gambro"), through its undersigned attorneys, and respectfully files this Motion to Dismiss this Bankruptcy Case (the "Motion").

### Preliminary Statement

The commencement of this bankruptcy case by the filing of a voluntary petition on October 15, 2004, was an illegal and unauthorized act by certain individuals whose positions were terminated, prior to this bankruptcy filing, by the new duly-appointed board of directors of Atlantis Healthcare Group Puerto Rico Inc. ("Atlantis").

Prior to this bankruptcy filing, Gambro, through its right to exercise a "proxy" vote of all of Atlantis' shares (which had

been pledged by the shareholders to secure more than $26 million in financing), elected a new board of directors of Atlantis, who then immediately appointed new officers and assumed control of Atlantis. However, Atlantis' former officers and directors have not only ignored and defied the directives of the newly appointed board of directors, but, without any corporate authority whatsoever, have paid a $20,000.00 retainer out of Atlantis' funds (not so incidentally, fully encumbered by Gambro's security interest) and commenced this bankruptcy case in an attempt to illegally re-assert control of Atlantis and displace the newly elected board.

Concurrent with this Motion, Gambro is filing a Motion for the Appointment of a Chapter 11 Trustee, in which Gambro requests the immediate appointment of a trustee until such time as this bankruptcy case is dismissed. In addition, as a precautionary measure (and without waiving its contention that this Honorable Court has no jurisdiction over Atlantis), Gambro has already filed a Motion for Adequate Protection and a Motion for Relief from the Stay, to safeguard its collateral in Atlantis' accounts receivables. Through this Motion, Gambro seeks an Order determining that the newly-appointed board is valid, and confirming that it is the sole authority over Atlantis and its assets (albeit subject to directives of this

Court), and asking the Court to dismiss the unauthorized bankruptcy case and voluntary petition of October 15, 2004.

## Jurisdiction

1.   This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.   This is a core proceeding pursuant to 28 U.S.C. § 157(b).   Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relevant Factual Background

2.   Atlantis is a corporation duly authorized and existing under the laws of the Commonwealth of Puerto Rico.

3.   Atlantis, at all material times prior to October 13, 2004, had five stockholders: 1043823 Ontario, Inc. (Dr. Otegbola Ojo, President), Olaiya Ojo, Gbolahan Mudasiru, Ayotunde Soleye, Henry Ukpeh, and Joseph Carter.

4.   On or about May 24, 2001, Atlantis entered into a certain Credit Agreement (as amended, the "Credit Agreement") with an institutional lender to which Merita Bank Plc, New York, acted as the administrative agent (the "Initial Administrative Agent").   The Credit Agreement provided Atlantis with a loan in an aggregate principal amount of $26,600,000 (the "Loan").

5.   Gambro AB served as the guarantor for the Loan.   The Loan was secured by substantially all of the assets of Atlantis,

including, among other things, Atlantis' accounts receivables.
In addition, as further security for the Loan, Atlantis' then-
shareholders entered into a certain Company Pledge Agreement (as
amended, the "Pledge Agreement", attached as Exhibit 1) with
Merita Bank Plc, New York.   Under this agreement, Atlantis'
shareholders pledged their equity interests as collateral for
the Loan and delivered their share certificates to the lender.

6.   The Pledge Agreement expressly provides, among other
things, that in the event of a default under the Credit
Agreement ("Event of Default", as such term is defined in the
Pledge Agreement), the administrative agent "may, without
notice, exercise all voting and corporate rights at any meeting
of the shareholders ... as if it were the absolute owner
thereof". See Section 7 of the Pledge Agreement, Exhibit 1.

7.   On or about August 2002, Atlantis began defaulting on
its obligations under the Credit Agreement.   Among other
deficiencies, Atlantis' management continuously failed to
satisfy certain interest and principal payment obligations to
its lender and failed to provide certain financial disclosures
required under the Credit Agreement.

8.   On July 15, 2004, Gambro AB, in the exercise of it
obligations as guarantor of Atlantis' obligations under the
Credit Agreement, purchased and assumed the Loan and all rights
and interests of the lender under the Credit Agreement and the

Pledge Agreement and accepted delivery of the pledged, endorsed share certificates previously held by the Initial Administrative Agent, pursuant to a certain Loan Purchase Agreement (the "Loan Agreement"). Gambro, Inc. acts as the administrative agent under the Loan Agreement and is the successor to all rights and interests of the Initial Administrative Agent.[1]

9.   Atlantis' financial situation continued to worsen. As outlined in Gambro's Motion to Appoint a Trustee, Atlantis was subject to the gross mismanagement and incompetence of its then president, Dr. Otegbola Ojo. Not a single payment was made to Gambro under the Loan Agreement from its effective date through the date of this pleading. Moreover, Gambro discovered that Dr. Ojo had apparently not paid taxes due and owing by Atlantis for several years and was not making payments to Atlantis' suppliers. It also appeared that Dr. Ojo had been purchasing supplies and medications for Atlantis at substantially above-market rates. Gambro attempted to consult with Dr. Ojo regarding potential restructuring avenues to improve the financial health of the Debtor. However, during these attempts at consultation, Dr. Ojo's proposed solutions were premised on business plans and projections prepared by him and his staff which were clearly unfounded, grossly exaggerated, unrealistic,

---

[1] The assignment was formally communicated, in writing, to Atlantis and its then-shareholders on August 6, 2004.

and impossible to execute.  It became apparent that Atlantis, under Dr. Ojo's guidance, had absolutely no prospect of devising and executing any sort of adequate restructuring process.

10. On October 13, 2004, given Atlantis' serial and continuing defaults, its inability to formulate a coherent strategy, and the risk that Dr. Ojo and his staff would continue to deplete Gambro's collateral, Gambro exercised certain of its rights under the Loan Agreement, in particular, its right to exercise a proxy vote for the shares of Atlantis.

11. To this end, on October 13, 2004, Gambro as the holder of 100% of the voting rights in Atlantis' shares, called and held a special meeting of stockholders as authorized by Section 7.13 of the General Corporation Law of Puerto Rico.  In the meeting, the total voting shares of Atlantis resolved to remove the board of directors and elect new directors.  That same date, the new duly-appointed board called a special meeting, in which the board voted to remove the previous officers, including Dr. Ojo, and proceeded to appoint new ones. The minutes of these meetings were transmitted by facsimile to Mr. Luis Acevedo-Bengoecha and Mr. Charles Cuprill, both of whom had represented Atlantis while Dr. Ojo was the president. Subsequently, on October 15, 2004, Atlantis' new COO, Mr. Michael Klein, terminated Mr. Acevedo and Mr. Cuprill as attorneys for Atlantis.

12.   Shortly thereafter, and in defiance of the new board's orders and without any corporate authority whatsoever, the former board officers and directors (the "Former Directors") retained Charles Cuprill-Hernandez Law Offices PSC as bankruptcy counsel, paid Mr. Cuprill a retainer of $20,000 out of Atlantis' corporate funds and caused to be filed, on October 15, 2004, an unauthorized petition for relief on behalf of Atlantis under chapter 11 of the Bankruptcy Code.   Since then, the Former Directors have: refused to recognize the new duly-elected board; refused to transition by illegally remaining entrenched in their positions; and, illegally and without any authority whatsoever, commenced this bankruptcy proceeding and diverted funds from Atlantis' accounts to pay Charles Cuprill-Hernandez Law Offices' retainer.

**Memorandum of Law in Support of Motion to Dismiss**

13.   Section 1112(b) of the Bankruptcy Code permits dismissal of a bankruptcy case for "cause." Bankruptcy Code §1112(b) provides in part:

> "[O]n request of a party in interest …, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or … may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause"

14. Cause exists to dismiss a bankruptcy case when the bankruptcy filing constitutes an unauthorized corporate act.

-7-

See e.g., Keenihan v. Heritage Press, Inc., 19 F.3d 1255, 1258
(8th Cir. 1994), citing Price v. Gurney, 324 U.S. 100, 106-07,
(1945). Thus, if a resolution by the board of directors
authorizing or ratifying a bankruptcy filing is invalid, the
petition must be dismissed. See, Price v. Gurney, at 106-07.
(stating court must dismiss a petition that is found lacking
authority under local law).

15. In the case of a corporation such as Atlantis, the
board of directors or the shareholders, as determined under
applicable state law, must properly authorize the execution and
filing of the petition. See In re Stavola/Manson Elec. Co., 94
B.R. 21 (Bankr. D. Conn. 1988). However, in this case, the
bankruptcy petition was executed and filed by a terminated
officer who had no authority whatsoever to act on behalf of
Atlantis.

16. Under applicable law, Gambro had the right to vote the
shares at the special meeting of shareholders, remove the
directors and elect a new board. When shares have been pledged
to a creditor, the right to vote the stock is governed by the
agreement between the parties. See e.g., Raible v Puerto Rico
Industrial Development Co., 392 F2d 424 (1st Cir. 1968); see
also In re Eastern Bancorporation, 23 B.R. 474, (Bankr. E.D. Pa.
1982) (A pledge agreement (substantially identical to the Pledge
Agreement in the instant case) allowing bank, upon default of

-8-

corporation's affiliates on loans, to exercise all voting and corporate rights of affiliates at meeting of corporation's shareholders was controlling over general provisions of statute requiring that, to be able to vote, shareholder must be shareholder of record at least ten days before meeting.).

17. Pursuant to the Pledge Agreement, upon an event of default under the Credit Agreement, Gambro is entitled to exercise the voting rights of 100% of the shares of Atlantis, and could therefore, as a matter of law, call a special meeting of the stockholders pursuant to 14 L.P.R.A § 2913, remove Atlantis' board of directors and appoint new directors for the corporation. See 14 L.P.R.A § 2721. See e.g., Sire Plan, Inc. v Mintzer, 237 NYS2d 123 (1963) (trustee-pledgee to whom certain stock had been issued to secure the payment of corporation notes was held to be entitled by statute as record stockholder to vote such stock for the removal of the directors of the corporate issuers, and for his election as a director and president of such corporations); In Re Argus Printing Co., 48 N.W. 347 (1891) (the pledgee's representative, in whose name the stock was registered on the books of the corporate issuer, was entitled to vote such stock, and that since, without the pledgor's stock, the successful slate of directors had not received a vote of stockholders representing a majority of the subscribed capital stock, the election would be set aside).

18.  At the time the bankruptcy petition was signed, the Former Directors had been effectively removed and had no authority to act on behalf of Atlantis.  The lack of authority of the Former Directors renders the bankruptcy filing unauthorized and therefore null and void, since the duly constituted board of directors did not authorize the bankruptcy filing.  Neither Former Directors, nor Pledgors, have the authority to direct the filing of a voluntary petition for Atlantis.  Therefore, this unauthorized and illegal bankruptcy filing must be dismissed.

WHEREFORE, GAMBRO respectfully moves this Honorable Court to determine that the petition in this case was unauthorized, null, and/or void; and dismiss such petition and this bankruptcy case; and grant GAMBRO such other relief as may be just.

In San Juan, Puerto Rico, on this 3rd day of November, 2004.

I certify that on this same date I have mailed a true copy of the foregoing by certified mail to each of: Charles A. Cuprill, Esq., 356 Fortaleza St. second floor, Old San Juan, PR

00901; and Atlantis Health Care Group Puerto Rico, Inc., P.O.

Box 1350 Saint Just Station, Trujillo Alto, PR 00978-1350.

> O'NEILL & BORGES
> Attorneys for
> Gambro, Inc.
> American International Plaza
> 250 Muñoz Rivera Avenue, Suite 800
> San Juan, PR 00918-1813
> Tel: (787) 764-8181
> Fax: (787) 753-8944

By: _____
    Hermann Bauer-Alvarez
    USDC No. 215205

EXHIBIT
1

COPY

## COMPANY PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT, dated as of June 12, 2001 is between each of the individuals or entity identified under the caption "PLEDGORS" on the signature pages hereof (individually, a "Pledgor" and, collectively, the "Pledgors"), and Merita Bank Plc, New York Branch, the New York branch of a Finnish banking corporation, as agent (hereinafter, in such capacity, together with its successors in such capacity, the "Administrative Agent") for the lenders or other financial institutions or entities party, as lenders (collectively, the "Lenders"), to the Credit Agreement referred to below.

Concurrently herewith, Atlantis Healthcare Group (Puerto Rico), Inc., a Puerto Rico corporation (the "Company"), the Lenders and the Administrative Agent are entering into a Credit Agreement (such Credit Agreement, as the same may be amended or supplemented from time to time, is referred to herein as the "Credit Agreement") providing, subject to the terms and conditions thereof, for extensions of credit to be made by the Lenders to the Company in an aggregate principal amount not exceeding $26,600,000 (the "Loans"). The Loans made or to be made by the Lenders to the Company shall be evidenced by certain promissory notes (as exchanged, replaced, amended, supplemented or modified from to time, the "Notes") in substantially the respective forms attached to the Credit Agreement.

Each Pledgor is the legal and beneficial owner of the number of shares of capital stock of the Company as set forth below the Pledgors' signature (such shares of capital stock and such additional shares of capital stock of the Company and any property at any time and from time to time receivable by the Administrative Agent hereunder or otherwise distributed in respect of or in exchange for any such shares, including any stock options or rights received as provided in Section 3 of this Agreement, are hereinafter referred to as the "Pledged Stock").

To induce the Lenders to enter into the Credit Agreement and to extend credit thereunder, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Pledgor has agreed to execute and deliver this Agreement.

1.     Defined Terms.  Unless otherwise defined herein, terms defined in the Credit Agreement shall have such defined meanings when used herein.

2.     Pledge.  Each Pledgor hereby pledges, assigns, hypothecates, transfers, and delivers to the Administrative Agent, for the benefit of the Lenders, all the Pledged Stock and hereby grants to the Administrative Agent, for the benefit of the Lenders, a first lien on, and security interest in, the Pledged Stock and, except as hereinafter provided, in all increases and profits therefrom and all proceeds thereof, together with appropriate undated stock powers with respect thereto duly executed in blank, as security for the payment, performance and observance of the Obligations and any amendments, extensions, renewals, refundings or modifications thereto or of any part thereof, whether now existing or hereafter incurred, matured or unmatured, direct or contingent, together with interest and costs of enforcement and collection thereof and of this Agreement, including all reasonable attorneys' fees and disbursements incurred by the Lenders or the Administrative Agent (collectively, the "Secured Obligations").

3.     Collateral.  All property at any time pledged with the Administrative Agent hereunder (whether described herein or not) and all increases, profits and income therefrom and proceeds thereof, are herein collectively sometimes called the "Collateral".

4.     Stock Dividends, Distributions, etc.  If, while this Agreement is in effect, any Pledgor shall become entitled to receive or shall receive any stock certificate (including,

- 2 -

without limitation, any certificate representing a stock dividend or a distribution in connection with any reclassification, increase or reduction of capital, or issued in connection with any reorganization, merger or consolidation, or resulting from a split-up, revision or other like change of the Pledged Stock or otherwise received in exchange therefor), option or rights, whether by purchase or other acquisition or as an addition to, in substitution of, or in exchange for any shares of any Pledged Stock, such Pledgor agrees to accept the same as agent of the Administrative Agent and to hold the same in trust on behalf of and for the benefit of the Administrative Agent, and to deliver the same forthwith to the Administrative Agent in the exact form received, with the endorsement of such Pledgor when necessary and/or appropriate undated stock powers duly executed in blank, to be held by the Administrative Agent, subject to the terms hereof, as additional collateral security for the Secured Obligations. Any sums paid upon or in respect of the Pledged Stock upon the liquidation or dissolution of the issuer thereof shall be paid over to the Administrative Agent to be held by it in trust as additional collateral security for the Secured Obligations; and in case any distributions of capital shall be made on or in respect of the Pledged Stock or any property shall be distributed upon or with respect to the Pledged Stock pursuant to the recapitalization or reclassification of the capital of the issuer thereof or pursuant to the reorganization thereof, the property so distributed shall be delivered to the Administrative Agent to be held by it as additional collateral security for the Secured Obligations. All sums of money and property so paid or distributed in respect of the Pledged Stock which are received by such Pledgor shall, until paid or delivered to the Administrative Agent, be held by such Pledgor in trust as additional collateral security for the Secured Obligations.

5.    Cash Dividends; Voting Rights. Subject to any restrictions in the Credit Agreement, the Pledgors shall be entitled to receive all cash dividends paid in respect of the Pledged Stock. If any Event of Default shall have occurred, then so long as such Event of Default shall continue, and whether or not the Administrative Agent or any Lender exercises any available right to declare any Secured Obligations due and payable or seeks or pursues any other relief or remedy available to it under applicable law or under this Agreement, the Credit Agreement or any other agreement relating to such Secured Obligations, all dividends and other distributions on the Pledged Stock shall be paid directly to the Administrative Agent and retained by it in the Company Account as part of the Collateral, subject to the terms of this Agreement, and, if the Administrative Agent shall so request in writing, the Pledgors jointly and severally agree to execute and deliver to the Administrative Agent appropriate additional dividend, distribution and other orders and documents to that end, provided that if such Event of Default is cured, any such dividend or distribution theretofore paid to the Administrative Agent shall, upon request of the Pledgors (except to the extent theretofore applied to the Secured Obligations and to the extent permitted by the Credit Agreement), be returned by the Administrative Agent to the Pledgors. So long as no Event of Default has occurred and is continuing under the Credit Agreement, the Pledgors shall be entitled (as permitted by the Company's Articles of Incorporation) to vote the Pledged Stock and to give consents, waivers and ratifications in respect of the Pledged Stock (as the case may be), provided, however, that no vote shall be cast or consent, waiver or ratification given or action taken which would impair the Collateral or be inconsistent with or violate any provision of this Agreement, the Credit Agreement, the Notes or the other Loan Documents.

6.    Amendments, Modifications and Waivers with Respect to Secured Obligations. Each Pledgor hereby consents that, without the necessity of any reservation of rights against such Pledgor, and without notice to or further assent by such Pledgor, any demand for payment of any of the Secured Obligations made by the Administrative Agent may be rescinded by the Administrative Agent and any of the Secured Obligations continued, and the Secured Obligations, or the liability of such Pledgor or any other party upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto,

- 3 -

may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered, or released by the Administrative Agent, and the Credit Agreement, the Notes, any collateral security documents (including, without limitation, the other Collateral Documents) or guarantees or documents in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent may deem advisable from time to time (subject to the consent of the requisite Lenders under the Credit Agreement), and any collateral security (including, without limitation, the Collateral Documents) at any time held by the Administrative Agent for the payment of the Secured Obligations may be sold, exchanged, waived, surrendered or released (in accordance with the terms thereof), all without the necessity of any reservation of rights against such Pledgor and without notice to or further assent by such Pledgor, which will remain bound hereunder, notwithstanding any such renewal, extension, modification, acceleration, compromise, amendment, supplement, termination, sale, exchange, waiver, surrender or release. The Administrative Agent shall have no obligation to protect, secure, perfect or insure any other collateral security document (including, without limitation, the other Collateral Documents) or property subject thereto at any time held as security for the Secured Obligations. Each Pledgor waives any and all notice of the creation, renewal, extension or accrual of any of the Secured Obligations and notice of or proof of reliance by the Administrative Agent upon this Agreement, and the Secured Obligations shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Agreement, and all dealings between the Administrative Agent and such Pledgor shall likewise be conclusively presumed to have been made or consummated in reliance upon this Agreement. Each Pledgor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon such Pledgor or any other person with respect to the Secured Obligations.

7. <u>Rights of the Administrative Agent</u>. The Administrative Agent shall not be liable for failure to collect or realize upon the Secured Obligations or any collateral security or guarantee therefor, or any part thereof, or for any delay in so doing nor shall it be under any obligation to take any action whatsoever with regard thereto. Any or all shares of the Pledged Stock held by the Administrative Agent hereunder may, if an Event of Default shall have occurred and be continuing under the Credit Agreement, without notice, be registered in the name of the Administrative Agent or its nominee, and the Administrative Agent or its nominee may thereafter without notice, exercise all voting and corporate rights at any meeting of any corporation issuing any of the shares included in the Pledged Stock and exercise any and all rights of conversion, exchange, subscription or any other rights, privileges or options pertaining to any shares of the Pledged Stock as if it were the absolute owner thereof, including without limitation, the right to exchange, at its discretion, any and all of the Pledged Stock upon the merger, consolidation, reorganization, recapitalization or other readjustment of any corporation issuing any of such shares or upon the exercise by any such issuer or the Administrative Agent of any right, privilege or option pertaining to any shares of the Pledged Stock, and in connection therewith, to deposit and deliver any and all of the Pledged Stock with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine, all without liability except to account for property actually received by it, but the Administrative Agent shall have no duty to exercise any of the aforesaid rights, privileges or options and shall not be responsible for any failure to do so or delay in so doing.

8. <u>Remedies</u>. Upon the occurrence of an Event of Default under the Credit Agreement or in the event that any portion of the Secured Obligations has been declared due and payable, the Administrative Agent, in addition to any rights of the Administrative Agent hereunder, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon the Pledgors or any other Person (all and each of which demands, advertisements and/or notices are hereby expressly waived), may forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, assign, give option or options to

- 4 -

purchase, contract to sell or otherwise dispose of and deliver said Collateral, or any part thereof, in one or more parcels at public or private sale or sales, at any exchange, brokers' board or at any of the Administrative Agent's offices or elsewhere upon such terms and conditions as it may deem advisable and such public sale or sales, (or, to the extent permitted by law, such private sale) to purchase the whole or any part of said Collateral so sold, shall be free of any right or equity of redemption of the Pledgors, which right or equity is hereby expressly waived and released.   The Administrative Agent shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale (after deduction of all reasonable costs and expenses of every kind incurred therein or incidental to the care, safekeeping or otherwise of any and all of the Collateral or in any way relating to the rights of the Administrative Agent hereunder, including attorneys' fees and legal expenses) against payment in whole or in part, of the Secured Obligations in such order as the Administrative Agent may elect (subject to statutory requirements), and only after so applying such net proceeds and after the payment by the Administrative Agent of any other amount required by any provision of law, need the Administrative Agent account for the surplus, if any, to the Pledgors. Each Pledgor agrees that the Administrative Agent need not give more than ten days' notice of the time and place of any public sale or of the time after which a private sale or other intended disposition is to take place and that such notice is reasonable notification of such matters.   In addition to the rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to any of the Secured Obligations, the Administrative Agent shall have all the rights and remedies of a secured party under the Uniform Commercial Code of the State of New York.

        9.    <u>Representations, Warranties and Covenants of the Pledgor</u>.  Each Pledgor represents and warrants that  (a) such Pledgor is the legal record and beneficial owner of, and has good title to, the Pledged Stock, subject to no pledge, lien, mortgage, hypothecation, security interest, charge, option or other encumbrance whatsoever, except the Lien created by this Agreement; (b) all the shares of the Pledged Stock have been duly and validly issued, are fully paid and non-assessable; (c) the pledge, assignment and delivery of such Pledged Stock pursuant to this Agreement creates a valid first lien on and a first perfected security interest in such shares of the Pledged Stock, and the proceeds thereof, subject to no prior pledge, lien, mortgage, hypothecation, security interest, charge, option or encumbrance or to any agreement purporting to grant to any third party a security interest in the property or assets of such Pledgor which would include the Pledged Stock; (d) such Pledgor has the power, right and authority to execute and deliver this Agreement; (e) the execution, delivery and performance by such Pledgor of this Agreement do not and will not (1) require any consent or approval of any Person that has not been obtained, (2) violate any provisions of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect applicable to such Pledgor, (3) result in a breach of, constitute a default under or otherwise contravene any indenture or loan or credit agreement or any other agreement, lease or instrument to which such Pledgor is a party or by which such Pledgor or such Pledgor's properties may be bound or affected, (4) result in, or require, the creation or imposition of any Lien (other than a Lien in favor of the Administrative Agent) upon or with respect to any of such Pledgor's properties now owned or hereafter acquired, or (5) cause such Pledgor to be in default under any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or any such indenture, agreement, lease or instrument; (f) this Agreement has been duly executed and delivered by such Pledgor and constitutes a legal, valid and binding obligation of such Pledgor, enforceable against such Pledgor in accordance with its terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally; and (g) there is no action, suit or proceeding pending or threatened against or otherwise affecting such Pledgor before any Governmental Authority or any arbitrator which may adversely affect the ability of such Pledgor to perform its obligations under this Agreement. Each Pledgor covenants and agrees that such Pledgor will defend the Administrative Agent's right, title and security interest in and to the Pledged Stock and the proceeds thereof against the claims and

- 5 -

demands of all persons whomsoever; and covenants and agrees that such Pledgor will have like title to and right to pledge any other property at any time hereafter pledged to the Administrative Agent, for the benefit of the Lenders, as Collateral hereunder and will likewise defend the Administrative Agent's right thereto and security interest therein.

10. _No Disposition, etc._   Without the prior written consent of the Administrative Agent, each Pledgor agrees that such Pledgor will not sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Pledged Stock or any of the other Collateral, nor will such Pledgor create, incur, or permit to exist any pledge, lien, mortgage, hypothecation, security interest, charge, option or any other encumbrance with respect to the Pledged Stock or any of the other Collateral, or any interest therein, or any proceeds thereof, except for the lien and security interest provided for by this Agreement.  Without the prior written consent of the Administrative Agent, each Pledgor agrees that such Pledgor will not vote to enable the Company to, and will not otherwise permit the Company to, issue any stock or other securities of any nature in addition to or in exchange or substitution for the Pledged Stock.

11. _Disposition of Pledged Stock._   (a) If the Administrative Agent shall determine to exercise its rights to sell any or all of the Pledged Stock pursuant hereto, and if in the opinion of counsel for the Administrative Agent it is necessary to have the Pledged Stock, or that portion thereof to be sold, registered under the provisions of the Securities Act of 1933, as amended (the "_Securities Act_"), the Pledgors will cause each issuer of. shares included in the Pledged Stock contemplated to be sold, to use its reasonable best efforts to execute and deliver, and will use its reasonable best efforts to cause the directors and officers of each thereof to execute and deliver, all such instruments and documents, and to do or cause to be done all such other acts and things as may be necessary or, in the opinion of the Administrative Agent, advisable to register the Pledged Stock, or that portion thereof to be sold, under the provisions of the Securities Act and to cause the registration statement relating thereto to become effective and to remain effective for a period of one year from the date of the first public offering of the Pledged Stock, or that portion thereof to be sold, and to make all amendments thereof and/or to the related prospectus which, in the opinion of the Administrative Agent, are necessary, all in conformity with the requirements of the Securities Act and the rules and regulations of the Securities and Exchange Commission applicable thereto.  The Pledgors agrees to cause each such issuer to comply with the provisions of the securities or "Blue Sky" laws of any jurisdiction which the Administrative Agent shall designate and to cause each such issuer to make available to its security holders, as soon as practicable, an earnings statement (which need not be audited) which will satisfy the provisions of Section 11(a) of the Securities Act.

(b)   The Pledgors recognizes that the Administrative Agent may be unable to effect a public sale of any or all of the Pledged Stock by reason of certain prohibitions contained in the Securities Act and applicable state securities laws, but may be compelled to resort to one or more private sales thereof to a restricted group or purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof.  The Pledgors acknowledge and agree that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner.  The Administrative Agent shall be under no obligation to delay a sale of any of the Pledged Stock for the period of time necessary to permit the issuer of such securities to register such securities for public sale under the Securities Act, or under the applicable state securities laws, even if the issuer would agree to do so.

(c)   The Pledgors further agree to use such reasonable efforts to do or cause to be done all such other acts and things as may be reasonably requested by the Administrative Agent which are within its power and necessary to make such resale or sales of any portion or all

- 6 -

of the Pledged Stock valid and binding and in compliance with any and all applicable laws, regulations, orders, writs, injunctions, decrees or awards of any and all courts, arbitrators or governmental instrumentalities, domestic or foreign, having jurisdiction over any such sale or sales, all at the Company's expense. The Pledgors further agree that a breach of any of the covenants contained in this paragraph 11 will cause irreparable injury to the Administrative Agent, that the Administrative Agent has no adequate remedy at law in respect of such breach and, as a consequence, agree that each and every covenant contained in this paragraph shall be specifically enforceable against the Pledgors and the Pledgors hereby waive and agree not to assert any defenses against an action for specific performance of such covenants. The Pledgors further acknowledge the impossibility of ascertaining the amount of damages which would be suffered by the Administrative Agent by reason of a breach of any of such covenants and, consequently, agrees that, if the Administrative Agent shall sue for damages for breach, the Pledgors shall cause the Company to pay, as liquidated damages and not as a penalty, an amount equal to the value of the Pledged Stock on the date the Administrative Agent demands compliance with this paragraph.

12.     <u>The Administrative Agent</u>. Without limiting any provision hereof, the Administrative Agent shall be entitled to the rights, powers, immunities, exculpations and privileges set forth in Article IX of the Credit Agreement as if the same were set forth in full in this Agreement. The Lenders shall have no rights hereunder to realize upon the Collateral or otherwise enforce the provisions of this Agreement, it being understood that such rights and remedies may be exercised only by the Administrative Agent.

13.     <u>Further Assurances</u>. Each Pledgor agrees that, at any time and from time to time upon the written request of the Administrative Agent, such Pledgor will execute and deliver such further documents and do such further acts and things as the Administrative Agent may reasonably request in order to effect the purposes of this Agreement.

14.     <u>Severability</u>. If any provision hereof shall be held to be invalid, illegal or unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction, and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

15.     <u>No Waiver; Remedies</u>. No failure on the part of the Administrative Agent to exercise, and no delay in exercising, and no course of dealing with respect to, any right, power, or remedy under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder and under any of the other Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The remedies provided herein and in the other Loan Documents are cumulative and not exclusive of any remedies provided by law.

16.     <u>Successors and Assigns</u>. The covenants, representations, warranties and agreements herein set forth shall be binding upon the Pledgors, the Pledgors' legal representatives, successors and assigns, and shall inure to the benefit of the Administrative Agent, the Lenders and their respective successors and assigns. The successor of the Administrative Agent hereunder shall forthwith become vested with and shall be entitled to exercise all the powers and rights given by this Agreement to the Administrative Agent, as if said successor were originally named as party herein.

17.     <u>Governing Law</u>. **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY CHOICE OF LAW RULES WHICH WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION**

- 7 -

**EXCEPT TO THE EXTENT THAT THE PERFECTION OF THE SECURITY INTEREST HEREUNDER, OR THE ENFORCEMENT OF ANY REMEDIES HEREUNDER, WITH RESPECT TO THE COLLATERAL SHALL BE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.**

18.    <u>Amendments</u>.  None of the terms or provisions of this Agreement may be waived, altered, modified, or amended except by an agreement in writing signed by the Administrative Agent and the Pledgors (but, as to the Administrative Agent, only with the consent of the Required Lenders as provided in the Credit Agreement).

19.  <u>Notices</u>.  All notices and demands to or upon the respective parties hereto to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or five (5) days after deposited in the mail, air postage prepaid, or in the case of notice by telecopier (fax), when sent (subject to confirmation of receipt), or in the case of overnight courier service and accepted for next day delivery service, one Business Day after delivery to a nationally recognized overnight courier service, addressed as follows or to such other address as may be hereafter notified by the respective parties to this Agreement:

    If to the Pledgor:

        At its address set forth below its signature.

    If to the Administrative Agent:

        Merita Bank Plc, New York Branch
        437 Madison Avenue
        New York, New York  10022
        Fax No. : (212) 421-4420
        Tel. No.: (212) 318-9300
        Attention:      Nordic Corporate Banking

- 8 -

**20.** **SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.** EACH PLEDGOR HEREBY IRREVOCABLY CONSENTS TO THE NONEXCLUSIVE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT SITTING IN NEW YORK COUNTY OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND EACH PLEDGOR HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE OR FEDERAL COURT. EACH PLEDGOR WAIVES ANY OBJECTION TO ANY ACTION OR PROCEEDING IN ANY STATE OR FEDERAL COURT SITTING IN NEW YORK COUNTY ON THE BASIS OF FORUM NON CONVENIENS. EACH PLEDGOR HEREBY WAIVES PERSONAL SERVICE OF ANY PROCESS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED OR REGISTERED MAIL DIRECTED TO EACH PLEDGOR AT THE ADDRESS SET FORTH IN SECTION 19 HEREOF. EACH PLEDGOR AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. EACH PLEDGOR FURTHER AGREES THAT ANY ACTION OR PROCEEDING BROUGHT AGAINST THE ADMINISTRATIVE AGENT SHALL BE BROUGHT ONLY IN ANY STATE OR FEDERAL COURT SITTING IN NEW YORK COUNTY. EACH PLEDGOR FURTHER AGREES THAT, AT THE DISCRETION OF THE ADMINISTRATIVE AGENT, THE ADMINISTRATIVE AGENT MAY SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW AND MAY BRING ANY ACTION OR PROCEEDING AGAINST EACH PLEDGOR OR EACH PLEDGOR'S PROPERTY IN THE COURTS OF ANY APPROPRIATE JURISDICTION. EACH PLEDGOR AND THE ADMINISTRATIVE AGENT HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE.

21. Termination. When all Secured Obligations shall have been paid in full and the Commitments under the Credit Agreement have expired or been terminated, this Agreement shall terminate, and the Administrative Agent shall cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect thereof, to or for the order of the Pledgors. The Administrative Agent shall also execute and deliver to the Company upon such termination such documentation as shall be reasonably requested as necessary by the Company to effect the termination and release of the Liens on the Collateral, all at the expense of the Pledgors.

22. Counterparts. This Agreement may be executed in any number of counterparts, all of which, when taken together shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing any such counterpart.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the day and year first above written.

Pledgors

1043823 ONTARIO INC.

By: _____

Name: DR. J OTEGBOLA OJO

Title: PRESIDENT

Pledged Stock: 5,750 shares

Address for Notices:

215 SIMCOE ST NORTH

OSHAWA, ON.

CANADA L1G 4T1

Gbolahan Mudasiru

Pledged Stock: 500 shares

Address for Notices:

11911, NATURAL BRIDGES LANE

SUGARLAND

TEXAS 77478 U.SA.

Olaiya O. Ojo

Pledged Stock: 2,000 shares

Address for Notices:

93 KINGS LODGE

PEMBROKE ROAD,

RUISLIP, MIDDLESEX HA4 8NJ

UNITED KINGDOM

FAX: +44 20 7504 8682

(Company Pledge Agreement)

_____

Dr. Ayotunde Soleye

Pledged Stock: 750 shares

Address for Notices:

14, CAVENDISH AV

LONDON   N.W.8

UK.        9JE

_____

Dr. Henry Ukpeh

Pledged Stock: 750 shares

Address for Notices:

2465  ALBERT   DRIVE

TRAIL   B.C

VIR   4T3.

_____

Joseph Carter

Pledged Stock: 250 shares

Address for Notices:

_____

_____

_____

**<u>Signature of Joseph Carter</u>**


**To be provided under
Separate cover**

Accepted as of this ____
day of May 24, 2001:

MERITA BANK PLC, NEW YORK BRANCH,
as Administrative Agent

By: _____
Name:
Its:         KARL FORSMAN
             Vice President

By: _____
Name:
Its: